Hear ye, hear ye, hear ye, the United States Court of Appeals for the 5th Circuit is now open according to law. God save the United States and this honorable court. Thank you gentlemen for participating in this. Can you not hear what? Mr. Vagonis, you raised your hand. Are you okay? I'm sorry, your honor. I'm sorry, your honor. I was signaling to someone in my room to get something off my screen. Oh, okay. All right. Well, good. I haven't done this for a while and I'm sure my colleagues will let me know if I'm misfiring. But we'll proceed in order and when we ask questions, we'll try not to step on each other's words, time delay or on yours. So it may be a little bit awkward. But other than that, this is not the first rodeo for at least two of us. So we very much appreciate your talking to us about what you perceive as the issues following remand from the Supreme Court. And we start with Mr. Heyer. Thank you, your honor. The primary issue is, in fact, the notice and comment issue that was in this court's en banc ruling and highlighted in footnote five. FDA's comparative efficacy standard is a rule adopted without notice and comment in violation of the APA and or FDA's own good guidance practices regulations at 21 CFR section 10.115. Why do we know this is a rule? Comparative efficacy requirement for standard is a rule because FDA premised the standard on its determination that all flavored ends products present a high uniform and immutable or fixed risk of youth initiation. And secondly, FDA did this in the abstract, divorced from the actual evidence of risk of youth use presented in any particular application, including the petitioner's applications. In fact, FDA for petitioner's applications ignored the specific evidence that was set forth that contradicted the assumptions underlying the standard, including the CDC's National Youth Tobacco Survey data. This was highlighted in A381, A434 and 35 that petitioners cited in their application showing that the bottled e-liquids are used by very few, if any, youth at all. And then also by the separate survey results in A235 that are in the administrative record that FDA had before it as well that showed the same thing from the National Youth Tobacco Survey. As this court's trilogy of cases, Philips Petroleum, Shell Offshore and W&T and Offshore Instruct, in addition to your honors, Judge Jones, RJ Reynolds Vapor state decision as well, developing a new standard in the abstract and then applying it uniformly across the regulated industry through individual orders or what appear to be adjudications does not make that standard any less of a rule. Mr. Hire, Supreme Court obviously of the United States had a lot to say about this case, went through the kinds of arguments that were successful in front of the Fifth Circuit, but were not there saying basically the initial guidance was followed by consistent guidance thereafter. And towards the end, you know the language better than I, the FDA had discretion to work out the meaning of the comparative standard when evaluating pre-market tobacco products in its individual decisions on applications. What do you do with that? I have a two-part response to that, your honor. First, if the court were to disagree that this was a rule and say we have to take it as gospel, this was adjudication, that doesn't remove this from the tobacco products standard section 387G and the notice and comment requirements under that. Secondly, I don't think the Supreme Court was actually opining on whether this was case adjudication or not, because it's specifically disclaimed to be addressing that at the beginning of the opinion. It did disclaim it, but didn't have the comments later that you're needing to respond to. And you have. You need to make the arguments you're making. But in setting it aside, they're saying we're not addressing the common analysis. Perhaps they went into it. But it also, is it fair to say the court did say that it is proper often to make these sorts of decisions in individual adjudications? The language I was reading to you. Yes, from January 2, agencies can develop. I think the Supreme Court is simply restating that agencies can develop standards in the course of adjudications. But here, and one of the key things that the Supreme Court was not addressing explicitly is that FDA has, in a way, sort of handcuffed itself through its own good guidance regulations good guidance practices regulations. It itself has said we are not going to communicate to regulated industry any new, and I'll give you the specific language, to support new or different regulatory expectations not readily apparent from the statute, other than through a notice and comment guidance. So to the extent that the court uses as an interpretive exercise, which is what I think the Supreme Court was referring to, I don't think the Supreme Court was considering because it specifically disclaimed it, that if FDA didn't have this regulation, maybe it would have more latitude, but it sort of limited itself through its own regulations and of course have the force of law as part of the CFR. And so that's, you know, apart from the tobacco product standard 387G, that's another way that FDA itself was restricted. And of course they didn't do that here. There was obviously no notice and comment. They did put out a guidance. The guidance had actually been finalized in 2019. And of course, as the Supreme Court reiterated, and we quoted some of the quotes from the opinion in our brief, nowhere did that guidance specifically say this comparative efficacy exercises needed to be done. Right? And that was part of the reason the Supreme Court ruled against us on the other arguments, the switch in position and all of that, that were obviously the subject of the en banc decision. Just one small point of clarification. What is it that the FDA said or did specifically? What, if you can identify it by date even, that needed to go through notice and comment as opposed to through an adjudication? Did the initial guidance 2019, as an example, what needed to go to notice and comment before it could be applied or whatever the right conclusion would be? The establishment of the comparative efficacy standard meaning, and it's sort of a standard of evidence in the applications, meaning that the non-tobacco flavored product has to outperform, have a higher switch rate, a reduction in combustible cigarette use compared to a comparator tobacco flavored product in order to be even eligible for a marketing granted order. And FDA first laid all of that out in, there was sort of a more limited reference in the internal fatal flaw memo in July of 2021. And that actually uses the language standard for evidence in that memo. But then the key document I think here is the August 17th, 2021 memo, because while FDA purported to rescind it, the content of it is literally copied verbatim into each and every technical project lead review for every flavored ends product that FDA then looked at going forward. So the substance of it, while they may not have cited to the memo, it's part of the administrative record and the substance of it clearly carried forward. Now at that point in time, they had not adjudicated, the agency had not adjudicated a single application and it doesn't talk about the specifics of any one application. It's talking about these generalized concepts and generalized facts. And in fact, the facts of petitioner specific applications run contrary to that. And in applying the standard, FDA actually ignored the specific facts in their application and sort of overrode those with the generalized facts. And that I think is indicative of the fact that what we have here is in fact a rule, not a, not a bona fide adjudication. So, excuse me, the Supreme Court made it clear that the TCA requires the FDA to deny such unless an application shows that its product would be appropriate for the protection of the public health. So what is it in the notice and comment that y'all don't have that you needed? Well, if we had gone through notice and comment, that's your question. How would we have weighed in and what evidence would we put in front of the agency about the standard? I'm just trying to understand your question. Well, I'm trying to understand what you're missing because when this came back from the Supreme Court, the FDA asked us to put it in abeyance so they could spend some time taking another look at you all and doing what they need to do. What is it that you didn't know you needed to send them for them to take the look and make the decision? Well, that was, that was a specific limited targeted review of the marketing plan. And we're not making any argument at this stage about the marketing plan. That was all that they were, that they were looking at, um, the, in terms of your honor, the governor's point is that the text of the TCA alone should have indicated we should have, we should have done this. That's clearly not the case. The Supreme Court itself said it kind of foreclosed that argument and the pen sites are 572 and 581 of its opinion. So it's hard to find any specific commitments about exactly what sorts of scientific evidence an applicant would have to provide. And it said FDA did not lay down any clear tests. And also we can't just have recourse to the statutory text because if that were the case, it would apply to all flavor, all flavored tobacco products. FDA has authorized, and this is in our brief as well, flavored pouch products without any evidence that the flavored pouch, the non tobacco flavored pouch products have higher comparative efficacy or switching rates than the tobacco flavored ones. So this is not something that just one can argue stems wholly from the, from, uh, the language and of the statute. And if it did, why would FDA need 11 pages, 24 footnotes and 66 end notes with scientific references to scientific and medical journals, um, to be able to elucidate what was supposedly clear from the text statute. Um, so clearly this is an interpretive, uh, exercise and it's a rule. Um, may I ask, I mean, I thought I addressed this in the RJR case, stay opinion. I agree your honor. I think, I mean, do you think it's binding following remand from the Supreme court? And if, is there an argument to be made that because we, because that opinion, uh, relied on the, uh, August 9th, I would say the August memo, uh, you know, the one that the Supreme court dissed, is there an argument to be made that the opinion, the opinion of our court is less binding for that reason? No, I think that, I think your reasoning is exactly right. The one point I wanted to make about footnote five of the en banc decision, which I realized is a little bit different than what your honors asked about is I think that is a little bit imprecise. I think the reasoning is correct, but that describes this as a, a ban on flavored products. And I would say that the reasoning is the same. It's not so much that it's a ban. It's the imposition of this, this evidentiary standard, right? That's lead to a lot of denials, but the reason. Yeah, well, the opinion I wrote was a little ambiguous about that, but it did get to the evidentiary standard point also. I agree. I think, and I think you're, I think your opinion is, is good law and it should control here. So I see that my time has expired. I'll reserve the rest for rebuttal. Thank you. Alrighty. Mr. Can't hear you. You're muted. Yep. Yep. Got the mute button. Sorry. Good afternoon, your honors. And may it please the court. Chris Vergonis for Amicus, RJ Reynolds Vapor Company. As Mr. Heyer just explained, notice and comment rulemaking was required because the comparative efficacy standard was developed outside of, and prior to any case by case adjudication under this court court's precedence in Shell Offshore and WNT Offshore. But notice and comment rulemaking was also required for the separate and independent reason that the comparative efficacy requirement is a tobacco product standard. And the Supreme Court said quite clearly in wages that notwithstanding Chenery 2, if a statute requires rulemaking, the agency must comply. And the Supreme Court reserved that question, Judge Southwood, this goes to your question from earlier in the argument, and said that that would be decided by the court on remand. And as this court has recognized. Excuse me. One of the things the Supreme Court did say, but obviously holding that issue, notice and comment for us to deal with by Zoom at this point today, is that the later understanding or later explanation that longitudinal comparative studies are necessary were a, and this is not a direct quote, you can probably do that for me, the natural outgrowth of the initial guidance. And that you understand how such evidence could be provided without some sort of comparative studies. Well, the Supreme Court made clear that comparisons are needed. And no one disputes that here. But the specific type of comparison required here is not necessarily, as Mr. Hire was saying, not necessarily mandated by the statute. They're all different sorts of comparisons that could be made. And the Supreme Court reserved for further review whether this is a tobacco product standard that was required to go through a notice of comment rulemaking because the statute unequivocally requires that. It uses the words shall and any. FDA shall use rulemaking procedures for the establishment of any tobacco product standard that section 387GC1, and the DC Circuit's FONTAM decision is instructive here where the court explained if the FDA for efficiency purposes wants to adopt bright line standards, it can do that. But it needs to use rulemaking to adopt those. And if it uses adjudication, it has to do an all things considered holistic approach to the application, which it did not do here. What case is that? That's the FONTAM. That's the DC Circuit Judge Rao's decision in the DC Circuit FONTAM case. I don't have the site handy, but it's in the briefing. In the brief. OK, that's all. In the brief. And it plainly applied a bright line performance standard here. You can see that in the TPL at issue in this case, the page A95 of the appendix. The FDA explained that the findings needed to show that the applicant's flavored product compared to a tobacco flavored product is associated with greater likelihood of either two behavioral outcomes for adult smokers, complete switching from cigarettes to vapor products or significant reduction in cigarettes per day. And in the first iteration of this case, before it went up to the Supreme Court, there was a debate about whether FDA had unduly restricted the types of studies. But the FDA requires the same showing regardless of study type. It's also evident from the wages TPL at appendix A97, where the FDA would consider other evidence, but only if that other evidence evaluated the same outcome, namely the impact relative to tobacco flavored products on adult smokers, switching or reduction in cigarette use over time. FDA has repeated this most recently in the March 11th draft guidance. And you can see FDA apply the standard in the TPLs for the small number of menthol vapor products where it has authorized them, such as the Enjoy TPL cited in our brief at page six. There's a link to it. The pages eight and 61 of that document, you can see how FDA applies this analysis using comparative percentage switching rates and this type of threshold. I'm sorry about the RJ Reynolds opinion by my colleague there on the screen. She'll tell me what it means later, but let me ask you what a part of it means. And that is when the opinion wrote, whether this was a heightened evidentiary standard to avoid notice and comment. If it is, it has to be a general statement of policy rather than a substantive rule. And that question, substantive rule versus policy, turns on whether an agency intends to bind itself to a particular legal position. It seems to me the Supreme Court has already dealt with that to say that these memos that you want us to rely on, which are certainly essential to the case, we're not binding and we're not different than the initial guidance, but a natural outgrowth. So help me understand to the extent we're bound by RJ Reynolds, excellent, clear opinion from this court. What do you do with that language? Is it even applicable anymore? Yeah, I see my time's expired. May I answer your Honor's question? I think I'll preside, at least to address that. But I think she'll say yes. Judge Jones, may I answer? Yeah, sure. Thank you, Your Honor. I think the Supreme Court there is just talking about something entirely different. As this court addressed in the earlier iteration of the case, the argument there was that there was surprise and therefore prejudice to the applicants who weren't on notice when they submitted their applications that FDA was going to apply this standard. And the Supreme Court said essentially that FDA had said enough, had given sufficient hints beforehand that this type of comparison would be needed. The Supreme Court, as I said, expressly reserved the question whether this is a tobacco product standard, and Your Honor referred to it as an evidentiary standard. I would say it's a performance standard. It's not just an evidentiary standard, but it's a target that the product has to meet in terms of moving people off cigarette smoking or reducing their cigarette consumption. And in that respect, it falls under the dictionary definition of a standard, under the ordinary meaning of a standard. FDA referred to it as a standard, so did the Supreme Court. The statutory text doesn't define standard, but as an example, it talks about the measurement of tobacco product characteristics, and we think this falls squarely within that definition or that meaning of standard. Thank you, Your Honors. Thank you. All right. Thank you, Mr. Koppel. Are you on mute? You're muted. He's looking for it. There we go. Good afternoon, Your Honors. May it please the Court. I'm Josh Koppel for the FDA. Petitioners again challenge FDA's order denying marketing authorization for e-cigarettes with flavors such as Jimmy the Juice Man, Peachy Strawberry, and Killer Custard Blueberry. I think this Court could dispose of the present arguments on the basis that they weren't raised before the panel last time around and they've been forfeited, but we also recognize that several other petitioners in this Court have raised the same or similar issues, so I do think it would be reasonable for the Court to just answer those questions now. Petitioners' AP notice and comment claim is meritless, and that follows almost directly from the Supreme Court's decision in this case. As Judge Southwick pointed out, the Supreme Court explained that the Tobacco Control Act's public health standard expressly contemplates comparisons of different tobacco products, and the Supreme Court further explained that FDA was not required to issue pre-decisional guidance setting out the comparative efficacy standard. Rather, FDA had discretion to work out the meaning of the TCA's comparative standard when evaluating pre-market tobacco product applications. Those are just quotes from the Supreme Court's decision, and that's exactly what FDA did here. Let me ask you what your opponent, opposing counsel, have been talking about. It is, it seems to be different on the Tobacco Control Act, a specific requirement to use rulemaking notice and comment in certain circumstances, so it seems to me the issue is, is any of this, which the Supreme Court didn't address, is any of this actually a standard? Is any of this actually a requirement that should be defined as a standard? And that, I need some help on that. I bet you have a view on it, aren't you? Absolutely. So, Section 387G addresses tobacco product standards. 387GA4 explains that FDA is permitted to establish a tobacco product standard, and these standards are ones that govern the construction, components, ingredients, additives, constituents, and properties of a tobacco product, like nicotine yields. They provide for testing of a product, or they could require certain labeling. But what petitioners and amicus challenge here is not that kind of tobacco product standard. It's a mode of analysis comparing the risks and benefits of a new flavored e-cigarette to those of other new tobacco products. Isn't that a property, Mr. Koppel? It's a property, number one. And number two, I thought you called it, I thought FDA called it a comparative efficacy standard at some point. Has FDA managed to write all these guidances and recommendations and so on and never used to say that this was a standard?  So, I believe it's petitioners that call this a comparative efficacy standard, but regardless, the word standard, I think, is not, the colloquial meaning of the word standard is not a tobacco, it doesn't line up exactly with the tobacco product standard as contemplated in 387G. Again, what FDA was doing here was simply applying the appropriate for the protection of the public health standard. I want to point you then, moving away from 387G for a minute, back to 387J. So, 387JC2 sets out the four circumstances in which FDA must deny an application to market a new tobacco product. One of those is if the petitioner, if the manufacturer has failed to demonstrate that its new product is appropriate for the protection of the public health. Another one of those circumstances, a different one, is if the product fails to meet a tobacco product standard. So, the tobacco product standard is different from the appropriate for the protection of the public health standard that FDA has to apply to any new tobacco product application. And that's what the D.C. Circuit explained in FONTM. Here, FDA didn't deny the applications because the products failed to meet a standard about ingredients, additives, labeling, but rather because petitioners didn't demonstrate that their products were appropriate for the protection of the public health. I take Your Honor's question about the word properties. I think that properties has to be construed in light of the surrounding words, construction, components, ingredients, additives. If you took properties to mean absolutely anything, including whether the product is appropriate for the protection of the public health, then now everything is a tobacco product standard. And it makes no sense then for 387J to distinguish between this public health analysis and the tobacco product standard. So here, FDA acted because petitioners failed to demonstrate that their product is appropriate for the protection of the public health, not because it failed to meet a tobacco product standard. Of course, the reason that a million of these applications were denied within a short period of time is that none of them knew that they had to have this comparison to show the demonstration of appropriateness. And therefore, even if you were correct about the tobacco product standard distinction, you still have something that is applied to every single one of these. It is not developed in adjudication. It's developed beforehand. And under the tests of the Fifth Circuit, it walks like a rule and it squawks like a  And it's subject to notice and comment under either the APA or FDA's good guidance. How do you get around those? So there's a few points made in there as well. I think just to take a hypothetical, suppose a manufacturer came up with a new tobacco product, twice as carcinogenic as cigarettes. No, let's just talk about, I worry about hypotheticals. I think that if that product, if such a product came before the FDA, FDA could reasonably say this isn't appropriate for the protection of the public health and deny the application. If 10 more manufacturers submit. So a million of them didn't do these studies, which at the time would have been considered rather novel. Nobody had done these comparative studies, right? Nobody. Court addressed this fair notice argument and rejected it unanimously. No, they addressed it in the context of an adjudication, not in the context of distinguishing between adjudication and rulemaking. I understand, but the fair notice point I believe is still the same. In addition, petitioners. Well, if that's so, if fair notice was so, then Justice Alito would not have wasted two pages at the beginning of his opinion saying that we are not ruling on the rulemaking issue. I mean, you're using the one part and I do not, you know, what this is going to, what this, how this will eventuate is not hard to see that even if this court were to say that it required a rulemaking, FDA will be able to accomplish a rulemaking in record speed and the petitioners will be back where they were from a substantive standpoint. But at least perhaps the agency will have realized that it can't do global regulation without rulemaking in situations as fraught as these questions about vaping. So FDA didn't engage in rulemaking. Petitioners can't point to any rule. I mean, they point to two things that they claim as a rule. First is that FDA adjudicated a lot of applications in a similar way. That's good consistency, good government practice. And if FDA hadn't done that, they'd be up here arguing that FDA treated similar cases differently. And the second thing that they point to is this August 17th memo. But the Supreme Court already rejected that, explaining the FDA didn't rely on it. And this court has to look at the marketing denial order here and the technical project lead review that explains the basis for that order. And if those documents can be sustained based on their application of the statutory standards, the applications at hand, then the court has to sustain those orders. Any attack on a memo that wasn't incorporated and referred to by these orders simply can't undermine. These orders required a type of study that nobody had really engaged in. Is that not correct? And if they did, it would cost thousands of dollars because each order was required to product specific in showing that your bubble gum flavored vape used by smokers caused fewer of them to see smoking than, you know, whatever the tobacco flavored one was, right? I don't think it's correct that no one had engaged in these studies. Well, I don't recall. FDA has authorized 10 products. When? No, you know, the agency, the agency denied hundreds of thousands of them. It wasn't until the shadow of consistent litigation that they started approving them. Isn't that fair to say? I mean, the agency told R.J. Reynolds, we're not dealing with menthol. And then all of a sudden, oh, yeah, we changed our mind. We are dealing with menthol. I don't believe that that's entirely correct. OK. First of all, we're not here on the fair notice issue. The Supreme Court rejected that argument. But in any event, there were applications that were authorized because the manufacturers had demonstrated that their products were appropriate for the protection of the health of the public health, because even though they presented greater risk to youth because they contain flavors, they also provided a countervailing benefit to adult smokers. These petitioners, as well as many others, didn't have that evidence. And simply because FDA denied many applications on these public health grounds doesn't mean that FDA enacted some kind of tobacco product standard or other rule. This August 17th memo, just to there's another point I want to make about this. Even if you thought or even if the court thought that, you know, it could consider it, even though, again, FDA didn't rely on it in issuing the orders under review here, even though it was rescinded, even though the Supreme Court accepted that it was never intended to be. First of all, it was part of an adjudication that sets out at most an interpretation of the statute at most. And it was never intended to be binding on the relevant decision maker. So the person who signed the decision order at issue here, the marketing denial order, is the director of the Office of Science of the Center for Tobacco Products. So a million denials use essentially the same language. I'm not quite sure how we, I agree with you, the Supreme Court very strangely said that that was rescinded and therefore played no role. But it is a fact, is it not, that in a 99% of all subsequent applications, they cited to exactly the same standard or comparison and they cited to something that had not been done.  And they use and they use that scientific comparison, which they found lacking to ignore the marketing issue that everybody had thought they had, that where everybody thought they would get approval. So again, so the August... Right. I mean, it had to be, according to our, you know, I've read very closely our decisions where we've distinguished between rulemaking and adjudication. And I mean, this is at least as powerful an indication of implicit rulemaking as any of those cases, because it ended up, I mean, it would basically put a hundred and, you know, I'm not saying vaping is a good thing, but they were arbitrarily putting hundreds of thousands of small businesses out of business. So if I'm... And it seems to me they ought to have at least the opportunity that the APA provided, where they get to submit their one million comments before the agency lowers the hammer on them and puts small out of business. So I think that I can answer these questions, if you'll indulge me. I will. I'll leave you alone. So when this August 17th memo was written, so again, you know, as law of the case, this was not relied upon, but in any event, to get there anyway, FDA already had applications before it. The director of the office of science was going to have to make a decision on these applications. This memo was written by the deputy director, went through the director, setting out his thinking about how the statute should be applied in a particular context. It couldn't be binding because it was written by the deputy director. The director signed the decision. So there's no way that this could possibly be a binding memo. Just going to set that out there. And then ultimately, for whatever reason, FDA decided to rescind this memo. And then the director signed marketing denial orders. Again, it's not surprising these orders, which were generally all signed by the same person at the same time, looked similar. And there's no principle of administrative law that when an agency denies many applications, it must use different words to do so. And, you know, again, this court needs to look at the marketing denial order under review here. And if it can be sustained on the basis of application of the statutory public health standard, as I think it's clear after the Supreme Court decision in this case, it can. There's no basis to grant the petition for review. And in my view, what you're suggesting would put a very big inroad into Loper Bright. I'm not sure that there's any Loper Bright issue here. I mean, I don't think that there's any. I mean, the Supreme Court made clear, I believe, that FDA's application of the statute was reasonable or was, you know, was appropriate under the Tobacco Control Act. I don't believe there's a question of statutory interpretation here. This is about. Well, except for the fact of what you're saying is that the agency is using the discretion that it allegedly had under the statute to do an adjudication, which in essence applies across the industry. I'm saying that FDA has discretion to adjudicate many applications in the same way, and it doesn't at some point become a rule. And it's also important to remember the petitioner manufacturers generally aren't prejudiced by FDA acting through adjudication rather than rulemaking. There are benefits and costs to the agency between the choice between and the choice between adjudication and rulemaking. If the agency goes through rulemaking, it's maybe a slower process, but it consolidates all challenges to that rule. If the agency prevails in any litigation over the rule going forward, it simply has to say this application failed to comply with the rule on that basis denied. By going through adjudication, FDA has to explain and sustain its decision in each case, and each manufacturer can bring a petition for review, challenging its mode of analysis, can go like in this case, all the way up to the Supreme Court. Look, R.J. Reynolds is a big boy. I'll bet you anything most of the participants in this market, or at least a substantial number of them, do not make a lot of money from selling to individual vape stores. And they probably make less money than you do, and certainly less than I do. And I couldn't afford to go through an adverse adjudication and litigate for six years. I mean, let us be realistic about the cost of agency regulation, particularly when you're dealing with a bunch of small businesses. Nonetheless, the APA leaves it to the informed discretion of the agency, whether to proceed by adjudication or rulemaking. The Tobacco Control Act permits the FDA to issue a tobacco product standard or to receive applications and simply decide under the statutory standard whether the new tobacco product is appropriate for the protection of the public health. FDA did not err by taking applications as they came, comparing them to the statutory standard, and issuing orders on that basis. I know you think— Oh, let me ask you— Oh, go ahead, excuse me. I'm trying to get a question in here. I'm sorry to step on yours. It seems to me that what the Supreme Court did in this case, and sending it back to us, is to leave unaddressed whether this non-surprise piece of the case was a non-surprise about a rule and standard as opposed to the normal processes of adjudication. Looking at what the Supreme Court did hold, it seems to me that if the matter for which there was no surprise was, in fact, a standard, a tobacco standard, then the general rules you're talking about, rulemaking versus adjudication and the rights to go either way, and the Supreme Court obviously was very clear about that, still needs to take into account the Tobacco Control Act requirement of rulemaking if you are establishing a standard. It seems to me that what the other people on the screen, the lawyers arguing here today, are talking about is that these comparisons that were being required, and whether it's through longitudinal comparative studies or otherwise, is the equivalent of a rule. That may be exactly how they would put it, but isn't it? I mean, it does seem to me that if it is, if that's the standard that has to be met to make these comparisons, it's getting awful standard. I don't want to state what the endgame was, but if that's what they have to meet, that does seem to be a standard. So again, I think that you need to look at 387gA4, which explains what a tobacco product standard is. It's about construction, components, ingredients. And then 387j makes clear that that type of tobacco product standard, right, is something like your nicotine can't be more than 5% of the e-liquid. Something like that. Or your labeling has to have in such and such font a warning. Those are tobacco product standards. That's fundamentally different from the inquiry under 387j, whether a new tobacco product is appropriate for the protection of public health. And 387j lays out considerations the FDA has to account for. So increased or decreased likelihood that non-users of tobacco products will begin using tobacco, increased or decreased likelihood that existing users will stop. And so that's, you know, that is a different inquiry. And simply because you can characterize public health benefit as a standard, doesn't make a tobacco product standard under Section 387g. Well, something, you could have a tobacco under 387j, you couldn't, couldn't you have a proposed tobacco standard that did not satisfy the APPH standard? So, for instance, if you, if it was, if some FDA of the future removed any marketing requirements or caveats or skull and crossbones from the sale of vape products, those, or if someone proposed to do that, rather, then they could, the application would be separately denied, even though there was a standard. You see what I'm saying? Those are not binary. They are complementary. I agree they're complementary. Tobacco product standards also need to be appropriate for the protection of the public health. This is made clear also with 387g, A4. Um, but, uh, you know, the, the public health standard is simply, we got away the risks and benefits. And, you know, if FDA had said, I see him over time, but if the court will indulge that I can just finish this, this answer, if the court, if FDA had said, uh, all flavors are banned, then I think that would, that could certainly be a tobacco product standard. But FDA didn't do that. You can have flavors. We're just going to consider the risks and benefits because we have to under the public health standard of the statute. It turns out that these flavors create substantial risk for youth. And to overcome that substantial risk, you've got to show something on the benefit side of the ledger. And specifically you've got to show, or I mean, what petitioners here tried to show was that their products would provide a benefit by helping adult smokers quit smoking or reduce smoking. That's what they tried to do. They simply failed to meet that, you know, their assertion with the evidence. I'm happy to answer any further questions, uh, but I know I'm out of time. So we'd ask the court to deny the petition for review. All right. So thank you, Mr. Heyer. Rebuttal. Thank you, Your Honor. Um, to address, I think Judge Southwick, your questions that you had asked a while back, I completely agree with you. This looks like a rule. It quacks like a rule. It's a rule. But if we look at 387G. Judge Jones had the duck. I know Judge Jones, but I think your comment toward the end of Mr. Cobble's discussion there was sort of getting to the same point. So, um, if we look at 387G, uh, subsection A4B, a little Roman one, uh, we have terms. What am I looking at? Tell me again. Uh, 387G, uh, A4B, little Roman one. Okay. Um, it talks about components, ingredients, additives, constituents, and properties. Okay. The, the triggering, the triggering, um, fact for application of the comparative efficacy requirement is that the product is not tobacco flavored. That goes to a question of the ingredients. Do the ingredients impart a flavor other than tobacco flavor, right? That's ingredients and additives and constituents, no matter how narrow or broad you want to define those terms. And clearly that clearly falls in that. And also properties is even broader term and it falls in there as well. So that is what triggers this requirement. And I agree with Mr. Bergonis that when we're, we are talking about a, uh, substantively a performance requirement that the non-tobacco flavored ends product has to, has to outperform in terms of switching or reduction in cigarettes, the tobacco flavored one. But, but in terms of the basis in the statute, why this is a tobacco product standard, it is, um, in briefly on this point, Mr. Koppel raised a, an argument about forfeiture. This has been an argument of ours going back to our original opening brief before the panel. And I think we cited it in our, in our reply brief, uh, supplemental reply brief here. Um, I want to say it's pages 45 through 47 of, of, of that. So we, we've certainly argued this. Um, I wanted to clarify a couple of facts about the menthol flavored products that FDA has in fact authorized that the factual record on this is clear. The, the, there are enjoy and there are dual products that have been authorized, or those are the first two that were authorized. Um, those authorizations came after this court's on bonk decision in this case. And for the enjoy application specifically, after the, the first wave of, of denials came out, you know, FDA originally sort of reserved on menthol and, and, um, grouped it with tobacco flavor and then came back later. And I know Mr. Verbonis in his case has all sorts of briefing on that. Enjoy. It's very clear from what's publicly available. And a lot of stuff isn't publicly available because of the confidentiality requirements. But from what is, what is available is enjoy came back and amended their application, put in supplemental materials about the sort of comparative efficacy study. And based on those, that amendment is then that they got that their products were authorized. So I know that one in particular, I looked at that very closely. So it, to say it was the case that, or suggest it was the case that applicants should have known, um, I think this is, this is the mark. I mean, this is very much something that happened years, years later. Um, I want to get, I want to get back to the fact just briefly before time expires. Um, I think judge Hans, if I'm understanding your question from earlier and I want to circle back to that real quickly, why is this important to these applicants now to petitioners now? Um, and I, I, I draw your honor's attention to what's happened recently with this March 11th, um, uh, guidance that came out where FDA is starting to create a dichotomy between certain non-tobacco flavors and others. And also the recent authorizations of the glass products that are a device that have this sort of, uh, device access restriction technology built in. And there were 20, there were 28 letters that went in on that. We are talking here with these petitioners. So I just finished my thought quickly about bottled e-liquids. These are dropped plastic dropper bottles. Okay. There is no, an FDA has suggested no way that you could incorporate a device access restriction into what is effectively merely a component of a, of a device that some can actually generate, uh, aerosol that the user can inhale. We're talking about bottles of e-liquid here. So I really want to underscore that these are not products that one can put a device access restriction on. And we've been able to go through the notice and comment process. This is certainly something that petitioners would have emphasized to FDA, um, that, that, um, they don't have the sort of workaround, right. That would initiate this, this requirement. So, um, with that, I see my time has expired. Um, we respectfully request the court grant the petitions for review. Thank you. All righty. Thank you very much. We appreciate your, um, participating and we will work on the case again.